SHIER *v.* AMERICAN RAILWAY EXPRESS CO.

1. CARRIERS — NEGLIGENCE — INTERSTATE COMMERCE — RULES AND REGULATIONS OF INTERSTATE COMMERCE COMMISSION BECOME PART OF CONTRACT.

   In an action for damages to horses shipped by express from one State to another. the contract under which they

On duty of carrier to hasten shipment or take other precautions to prevent loss without any antecedent fault on its part, see note in 39 L. R. A. (N. S.) 640.

Effect of shipper's negligence in loading car, or as to condition of car upon carrier's common law liability, see note in L. R. A. 1915C, 1222.

were shipped is to be construed in harmony with the Federal transportation act, under the regulations, rates, and rules promulgated pursuant thereto by the interstate commerce commission, which, so far as applicable, became part of the contract.[1]

2. SAME — TRIAL — INSTRUCTIONS — WHERE COURT CORRECTLY IN-STRUCTED JURY FAILURE TO NAME SOURCE OF APPLICABLE RULES OF LAW IMMATERIAL.

In so far as the court correctly instructed the jury as to the rights and duties of the parties under the contract, where not affected or modified by the Federal act or authorized regulations and rates of the interstate commerce commission, failure to name the source of the rules of law given for the jury's guidance may be regarded as immaterial.[2]

3. SAME—CONTRIBUTORY NEGLIGENCE—IMPUTABLE NEGLIGENCE.

Where, under the contract, plaintiff assumed the responsibility as caretaker of the horses on the trip and also relieved defendant of liability for the conduct or acts of the horses to themselves or to each other, or for any loss or damage arising from their condition or propensities, under plaintiff's testimony that they were all right when they arrived at Ashland, and that the damage was caused by negligent switching of the car at said place, where they were unloaded, if they were not all right when they so arrived, that fact is imputable to plaintiff's negligence or to the acts and propensities of the horses themselves.[3]

4. SAME—NEGLIGENCE—TRIAL—INSTRUCTIONS.

Under plaintiff's testimony that the horses were all right when they reached Ashland, and that the damage was caused by defendant's negligent switching at said place, and there being no proof of any collision, violent switching, or other negligent moving of the car before it reached there, the court properly limited defendant's negligence to its acts in moving and switching the car after it arrived at Ashland.[4]

5. SAME—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.

Upon the conflicting testimony as applied to the contractual rights and duties of the parties, the trial court

[1]Commerce, 12 C. J. § 114; [2]Carriers, 10 C. J. § 603; [3]Id., 10 C. J. § 584 (Anno); [4]Id., 10 C. J. § 603.

properly left the question of plaintiff's contributory negligence to the jury.[5]

6. SAME — CONTRACTS — VALIDITY WHERE SHIPPER ACCOMPANIES CAR AND RELIEVES CARRIER OF LIABILITY FOR CARE.

A contract whereby a shipper of horses by express was furnished free transportation on condition that he act as caretaker of the horses on the trip and relieve the carrier of liability therefor, is valid both as to intra- and interstate shipments.[6]

7. SAME—NEGLIGENCE—QUESTION FOR JURY.

Testimony by defendant's agent that the horses were quiet when the car arrived at Ashland, and that after it had been switched there was a stampeding and a great deal of noise in the car, when considered in connection with plaintiff's testimony that the train crew were in a hurry to get home, started the car off in a hurry, and handled it pretty rough, *held*, sufficient to carry to the jury the question of defendant's negligence in switching the car.[7]

8. SAME — EVIDENCE — CONCLUSION OF WITNESS — WORDS AND PHRASES.

Defendant's contention that plaintiff's statement that in switching the car was handled "very rough" was a mere conclusion, is without merit, in view of the fact that he had had some experience in railroading, that "rough" or "roughly" is defined in the dictionary as "careless," "hasty," "crudely done," "rudely," "characterized by violent or disorderly action," and that courts have been content to refer to negligent switching as "rough handling" of the car.[8]

9. SAME—EVIDENCE—TESTIMONY AS TO TIME CONSUMED IN MAKING TRIP ADMISSIBLE.

While defendant was only bound to transport the horses with reasonable care in operating its means of transport, it was competent to show, as bearing on the situation which arose at Ashland, both the time consumed on that particular trip and the customary time taken for such transportation.[9]

10. SAME—CONTRACT OF SHIPMENT—VERBAL AGREEMENT OF AGENT VOID AS TO INTERSTATE SHIPMENT.

A verbal agreement of an agent of a carrier to transport

[5]Carriers, 10 C. J. § 601; [6]Id., 10 C. J. § 210 (Anno); [7]Id., 10 C. J. § 601; [8]Carriers, 10 C. J. § 593 (Anno); Evidence, 22 C. J. § 621 (Anno); Rough, 34 Cyc. p. 1816 (Anno); Rough Handling, 34 Cyc. p. 1816; [9]Carriers, 10 C. J. §§ 103, 593 (Anno).

stock by a particular train at a particular time is void, as applied to interstate shipments under the Federal act to regulate commerce.[10]

11. SAME—EVIDENCE—CONTRIBUTORY NEGLIGENCE.

Proof of plaintiff's inquiry of defendant's agent as to when the car load of horses would arrive at its destination, and the agent's answer, was admissible, not as evidence of a contract, but for its possible bearing on the question of plaintiff's contributory negligence in what he did and failed to do in caring for the horses on the trip.[11]

12. SAME—CARRIER'S DUTY TO INFORM SHIPPER OF HORSES OF POSSIBLE DELAY.

Where defendant knew that, owing to lack of available power and weather conditions, the shipment of horses was liable to be delayed, it was its duty, on proper inquiry by plaintiff, to inform him of the true situation.[12]

13. SAME—FRAUD OF SHIPPER NOT ESTABLISHED.

That the contract of shipment, over plaintiff's own signature, stated that there were 28 horses loaded in the car, when in fact there were 32, *held*, insufficient ground for imputing fraud, in view of the fact that 28 was the minimum load for the type of car used, and that plaintiff paid and defendant accepted full express charges for the 32.[13]

14. SAME—EVIDENCE—WRITTEN CONTRACTS—PAROL TESTIMONY ADMISSIBLE TO EXPLAIN WRITING.

Whether there was a declared or release valuation by the plaintiff on the car load of horses was open to question under the written evidence, and the trial court was in error in excluding proposed testimony of defendant's agent on the subject.[14]

15. SAME — DAMAGES TO INTERSTATE SHIPMENT OF HORSES — CONTRACT SUBJECT TO MODIFICATION BY RULES, ETC., OF INTERSTATE COMMERCE COMMISSION.

The basis for computing damages to horses specified in the contract of transportation in an interstate shipment is subject to modification by the rules, schedules, and rates approved by the interstate commerce commission, and failure of the trial court to so instruct the jury was reversible error.[15]

---

[10]Carriers, 10 C. J. § 303; [11]Id., 10 C. J. § 593 (Anno); [12]Id., 10 C. J. § 354 (Anno); [13]Id., 10 C. J. § 600 (Anno); [14]Evidence, 22 C. J. § 1715; [15]Carriers, 10 C. J. §§ 603 (Anno), 612 (Anno).

16. SAME—DAMAGES—INSTRUCTIONS—BURDEN OF PROOF.

In view of the fact that, under the contract, plaintiff assumed the responsibility as caretaker of the horses on the trip, and also relieved defendant of liability for the conduct or acts of the horses to themselves or to each other, or for any loss or damage arising from their condition or propensities, and of the further fact that plaintiff testified that he did not properly inspect the horses during the trip, the trial judge was in error in refusing to charge the jury, as requested, that mere proof that some of the horses were dead when the car reached Ashland, and that others were injured there upon or after arrival was not sufficient of itself to establish defendant's negligence or liability, but that the evidence must go further, and the burden of proof was on plaintiff to establish that the damage was due to human agency.[16]

Error to Gogebic; Driscoll (George O.), J.   Submitted June 16, 1925.   (Docket No. 58.)   Decided April 30, 1926.

Case by Richard R. Shier against the American Railway Express Company for damages to certain horses in transit.   Judgment for plaintiff.   Defendant brings error.   Reversed.

*Charles M. Humphrey,* for appellant.

*E. W. Massie,* for appellee.

STEERE, J.   In 1921 plaintiff was a dealer in horses, located at Hurley, Wisconsin, where he had a sales stable.   In February of that year he purchased a car load of horses at or near the village of Deep River, Iowa, for shipment to Hurley.   He was experienced in shipping horses by rail and ordered a proper car for that purpose and season of the year from defendant, a common carrier engaged in intra- and interstate transportation.   Defendant provided him an

---

[16]Carriers, 10 C. J. § 603 (Anno).

"Arms palace car," which he approved, and on February 11, 1921, his agent loaded the car for him at Deep River with 32 horses shortly before the passenger train which took the car pulled out.    Plaintiff was not present when the car was being loaded, but intended to and did accompany the shipment.    Before taking the train he signed, and received his copy of, the contract for transportation filled out and furnished by defendant's agent at Deep River.    The form of contract was one previously adopted, filed with and approved by the Federal interstate commerce commission, and prescribed by it under an order previously made.    It was a "nonnegotiable live stock contract (in triplicate)" under the heading *"uniform contract for ordinary livestock,"* which was to be only used "for the transportation of cattle, swine, sheep, goats, horses (etc.), not chiefly valuable for breeding, racing, show purposes or other special uses."    The shipment is described as "28 head horses" and the total charge is stated to be $423.60.    It furnished him free transportation as accompanying owner and was his evidence of right thereto when on the train transporting his shipment.    Amongst other things it provided:

"SECTION 3.    The shipper agrees that the express company shall not be liable for the conduct or acts of the animals to themselves, or to each other, such as biting, kicking, goring or smothering, nor for loss or damage arising from the condition of the animals themselves, or which results from their nature or propensities, which risks are assumed by the shipper. The shipper hereby releases and discharges the express company from all liability for delay, injuries to or loss of said animals and paraphernalia, from any cause whatever, unless such delay, injury or loss shall be caused by the express company or by the negligence of its agent or employees.

"The amount of any loss or damage for which any carrier is liable shall be computed on the basis of the

value of the animals at the place and time of shipment under this contract. * * *

"SECTION 5. Where said animals are accompanied by the owner or an attendant in his employ, the following further conditions shall apply, viz.: The shipper agrees to load, transship and unload said animals at his own risk, the express company furnishing the necessary laborers to assist. The shipper shall take care of, feed and water said animals while being forwarded or transported, whether delayed in transit or otherwise, and the express company shall not be under any liability or duty with reference thereto except in the actual forwarding thereof. The shipper further undertakes to see that all doors and openings in the cars in which said animals are shipped are at all times so closed and fastened as to prevent the escape of any of said animals or injury thereto, and the express company shall not be liable on account of the escape of any of said animals or any injury thereto resulting from open doors or defective ventilation." * * *

The Arms palace car was an express car for horses with side doors and a door in each end and swinging gate partitions inside. Plaintiff said the car was divided into a compartment in each end by a gate or sort of partition in the center. Plaintiff's agent who loaded the car said there were two gates in it and "a partition that separated two parts of the car." He said he had loaded horses on cars for years and loaded this car with 32 horses, packed in untied, and of the loading he said:

"I thought I loaded them right. We always load all the horses we can get in a car. * * * I think horses ship better when they are loaded tight, and I always had instructions to load them that way."

One of the 32 was a saddle horse weighing about 1,100 pounds and the rest were heavy draught horses weighing from 1,600 to 2,000 pounds. Plaintiff said he did not know how many horses there were in the car when they left Deep River, but, being pressed on

the subject, said "now, I possibly knew how many horses I had in that car, yes."

· The car load of horses left Deep River about 2:50 p. m. taken by passenger trains on which plaintiff was a passenger from Deep River, Iowa, to Ashland, Wisconsin, passing through Mason City and Manly, Iowa, and St. Paul, Minnesota, at which points it was transferred to other trains than the one with which it started. The transfer to another train at Manly was, as plaintiff testified the conductor told him, because the 10-car train which had picked it up at Mason City about 10 miles south of Manly was "too heavy and they wouldn't pull it." The train master of that road testified that owing to power and weather conditions instructions were. not to attempt to handle over 10 cars in that train. The next north-bound passenger train due in Manly two hours later picked the car of horses up, but owing to that delay and a further one caused by derailment of another train, they missed connection at St. Paul with the forenoon east-bound train due in Hurley at 8 p. m., and were taken by the next passenger train for Ashland, leaving St. Paul at 4:15 p. m. and arriving at Ashland on time at 10:45 p. m., which was the end of its run.

Before the train crew quit and dispersed at Ashland they spotted the car of horses on a side track near the platform at the end of the station, which was agreeable to plaintiff, who said he "was going to get out of there early in the morning." When they arrived at Ashland the horses had been, as plaintiff states, loaded on a car between 28 and 30 hours without unloading, which is within the 36-hour limit fixed by the interstate commerce commission.

While accompanying this shipment as owner, plaintiff assumed the responsibility of inspecting, caring for, feeding and watering these horses in consideration of free transportation for himself. He made the journey

in a passenger car. He said he went back at different stopping places to look at the horses, but never opened a door of or was in the car carrying them, his inspection of them being from the outside of the car. Of this his agent who loaded the car at Deep River, and testified to many years of experience both in loading and as caretaker during transportation, was asked and answered in part:

"*Q.* You could look in the car and see the horses?
"*A.* From the door, from the side door. What could you see if you did? You might see one horse.
"*Q.* You could see them all, couldn't you?
"*A.* No, sir, absolutely not. If you opened the side door and looked in you could not see all the horses. The only way to inspect a car to see all the horses would be to go to both sides of the car and open each and every door and inspect them. That would be the only proper way to inspect a car. In that way you could see them all. There is four doors. You would have to open all the doors to see all of the horses."

This plaintiff never did until the train arrived at the depot in Ashland. After its arrival, and before the car was spotted, defendant's agent met him at the train with hay for the horses and asked him if they were all right, to which he replied in the affirmative. His excuse for not inspecting the horses during the trip in "the only proper way" was that he could not open the doors. He is not shown to have tried to or have asked aid from any of the train crew at any time, and he apparently had no trouble in opening the door at Ashland after the car had been spotted. His testimony as to what then transpired runs in part as follows:

"*Q.* While you were standing there the horses seemed to be all right, didn't they?
"*A.* They did.
"*Q.* You heard no noise in the car?
"*A.* Nothing unusual at all.

234—Mich.—33.

"*Q.* If a horse was down you say it would be groaning or making some effort to get up?

"*A.* Yes, it would.

"*Q.* When you were talking with Mr. Kramer and Mr. Schulze, you were standing quite close to the car?

"*A.* I was leaning up against the car part of the time when I was talking.

"*Q.* Then the engine took that car and put it around at the end of the depot?

"*A.* Yes.

"*Q.* And then the train crew and that engine left?

"*A.* Yes.

"*Q.* Now, when you got the car around to the end of the depot was the first time that you had notice that there was any damage to the horses, wasn't it?

"*A.* Yes.

"*Q.* About what time was that?

"*A.* Shortly after we arrived; ten or fifteen minutes; something like that.

"*Q.* Ten or fifteen minutes after you arrived. That was after the train crew had left and the engine had gone?

"*A.* Yes.

"*Q.* Now, just tell us what noise you heard and what first called your attention to the horses?

"*A.* After it was set out?

"*Q.* Yes.

"*A.* Before I got up close to the car I could hear a horse moaning. I opened the door. There was a horse down in one end. I could hear them in the other end. I went to the other end and opened that door a little and looked in. There were two down there that I could see. They were struggling and kicking to get up."

The station agent was with him at that time and at his request took immediate steps to get the car moved down to the stock chute for unloading. The train crew was then gone and a switching crew had to be gotten; men had to be summoned for that purpose. A veterinary surgeon was also summoned. With the delays in getting the men there and the switching engine out, it was some two hours before

the car was properly placed at the stock chute and unloading begun. When the car was finally unloaded five dead horses were found in it, and it is claimed that several of the others were bruised and injured. The saddle horse lay dead in one compartment and four of the heavy draught horses in the other. The veterinary said the saddle horse was badly bloated, his eye was sunken and he had been dead 10 or 12 hours, in his opinion. Of others he replied:

"All I can say is that I saw two go down and die. In my opinion they died from exhaustion; they just fought themselves to death. They were all entangled. They had their heads underneath each other."

Plaintiff filed a claim for damages with defendant, which was not paid, and over two years later he commenced this action, asking judgment for $3,000 damages. The case was tried by jury and plaintiff had verdict with judgment for $3,000. Motion for a new trial was denied, and the case is here for review on half a hundred assignments of error. The more graphic and tangible ones relate to refusal of the court to direct a verdict for defendant, urged on the grounds that no actionable negligence of defendant appeared while plaintiff was shown guilty of contributory negligence; that the shipment was interstate and governed by Federal statutes, schedules and tariffs authoritatively approved by the interstate commerce commission as interpreted by the Federal courts, while the trial court submitted the case to the jury without any reference thereto; refusal to charge as requested; errors in the charge as given; the verdict was against the great preponderance of evidence and excessive.

Unquestionably this was an interstate shipment, and the contract under which the consignment was transported was authorized by and within the scope of the Federal transportation act, to be construed in harmony

with that act under the regulations, rates, and rules promulgated pursuant to it by the interstate commerce commission, which, so far as applicable, became a part of the contract. In so far as the court correctly instructed the jury as to the rights and duties of the parties under the contract, where not affected or modified by the Federal act or authorized regulations and rates of the interstate commerce commission, failure to name the source of the rules of law given for the jury's guidance may be regarded as immaterial. We are impressed, however, as will be later discussed, that the court prejudicially ignored the import of certain of those rules and regulations when charging the jury as to the measure of damages.

Upon the conflicting testimony as applied to the contractual rights and duties of the parties, the court correctly left both the questions of defendant's negligence and plaintiff's contributory negligence to the jury, limiting the former under plaintiff's own testimony and the undisputed facts to the issue of defendant's conduct in moving and switching the load of horses after it arrived at Ashland in such a careless and negligent manner as to result in the injury of which plaintiff complains. As applied to this contract, there is no conflict between the Federal and State laws upon those propositions.

As to plaintiff's negligence, there is no proof of any collision, violent switching, or other negligent moving of this car by defendant before it reached Ashland. In consideration of free transportation furnished plaintiff to accompany this car load of horses as caretaker, he contracted to load and unload them, look after the doors and openings in the car, take care of, feed and water the animals while being forwarded, whether delayed in transit or not, and also that defendant should not be liable for the conduct or acts of the horses to themselves or to each other by biting, kick-

ing or smothering, nor for any loss or damage arising from their condition or propensities. Having assumed that responsibility, he, as their caretaker during the trip, testified the horses were all right when they arrived at Ashland. If they were not, that fact is imputable to his negligence or the acts and propensities of the animals themselves. That a contract of this kind is valid, both as to intra- and inter-state shipping of stock where the owner or his agent accompanies the shipment, is settled law. The reason for so recognizing it is stated in 1 Hutchinson on Carriers (3d Ed.), § 336:

"Animals may injure or destroy themselves or each other; they may die from fright or from starvation, or they may die from heat or cold. In all cases, therefore, where injuries occur by reason of the inherent vices or natural propensities of the animals themselves, the carrier is relieved from responsibility if he can show that he has provided all suitable means of transportation, and exercised that degree of care which the nature of the property requires. And the opinion has been frequently expressed that, owing to these peculiarities of such freight, the carrier in its transportation was not to be considered as assuming the responsibilities of the common carrier, and that it was always competent for him to make his own terms upon which he would consent to carry it."

Where under a contract of free transportation the owner and shipper accompanies the live stock as caretaker he has the same or better knowledge than the carrier of the conditions and needs of the stock while in transit. If plaintiff had opened the doors at various stopping places during the journey he could have inspected all the horses in the "only proper way" and made certain his assertions that they were all right. He admits that he did not do this. His equivocal excuse for not doing so because he could not open the doors is without force. His agent loaded the car,

fixed the ventilators and the doors.    He opened them readily at Ashland.    If he met any difficulty in doing so before then, defendant's agents were at his service and he made no appeal to them.    The question of his contributory negligence was properly submitted to the jury.

Early in the charge the court instructed the jury as to the burden of proof and preponderance of evidence, followed by the statement:

"The plaintiff, before he can recover, must prove that there was negligence on the part of the defendant company in one or more of the respects charged in the declaration, that such negligence was a proximate cause of the injury, and that he himself was free from any negligence which contributed to the injury.    This instruction you will bear in mind as you go along and as I go along.    *    *    *    And in the transportation of the horses the defendant company was not, as it would be in the case of an ordinary shipment of inanimate chattels, an insurer, but was relieved of an insurer's liability.    *    *    *    The mere proof of delay is not proof of negligence, and the mere fact that this car of horses was not attached to the first passenger train out of Manly, Iowa, after reaching Manly, is not proof of such negligence.    It was, as stated, however, the duty of the defendant express company to transport the horses with reasonable despatch, and the railway companies in transporting the horses acted as agents of the express company, so that the express company would be bound for the negligence, if any, of the railway companies, or any of them, in and about the transportation of the horses."

Later in the charge, while submitting the question of defendant's negligence at Ashland to the jury, the court said:

"I do not think there is any evidence in this case upon which you could predicate liability on the part of the express company on the mere fact of delay alone, even though you conclude there was a negligent delay, but if there was a negligent delay you would

have a right to take that into consideration in determining what effect it would have upon the horses if the horses were negligently delayed at Ashland, in the consequence one of them fell and a stampede or anything like that occurred."

There was testimony to go to the jury upon defendant's claimed negligence in handling the car of horses after its arrival at Ashland. Plaintiff's testimony upon that subject is in part as follows:

"*Q.* Now, Mr. Shier, when they unhooked that car at Ashland, tell the jury the manner in which that car was switched up the yard?

"*A.* Well, they were very anxious. The conductor, I do recall of him coming to me and saying they would have to get rid of this car right away, because they were in a hurry to get home, or their time was up or something; I don't recall just what it was. They took the car. When they hooked on to the train they went down some place in the yard with it. They weren't gone very long. They went from there in a hurry. I was standing right alongside of them.

"*Q.* Did they handle that car in what you consider a careful manner at that time, Mr. Shier?

"*Mr. H—:* I object to that as calling for a conclusion of the witness.

"*The Court:* He may state how they handled it.

"*A.* They handled it, in my estimation, very rough.

"*Mr. H—:* I move to strike that out as irrelevant and incompetent. It is a conclusion, a voluntary conclusion of the witness.

"*Mr. M—:* That is about the only answer the witness could give to such a question. It isn't a conclusion.

"*The Court:* The answer may stand.   *   *   *
(Cross-examination.)

"*Q.* You say in your opinion they handled that car roughly; what do you mean by that?

"*A.* They hooked right on to it and started right off in a hurry and set the car out.

"*Q.* That is all there was to it?

"*A.* That is all I seen of it.

"*Q.* You didn't stop to see whether they jerked the car or not?

"*A.* They started off—they started off in a hurry. I have railroaded a little myself in the woods.

"*Q.* They started off in a hurry?

"*A.* Yes, they did.    They handled it pretty rough.

"*Q.* At that time you hadn't noticed that there was anything wrong with the horses?

"*A.* I don't think there was anything wrong with them then.

"*Q.* You think that all the damage was done after that?

"*A.* Yes, sir, setting them out; it surely was."

Kramer, defendant's agent at Ashland who met the train on its arrival with some hay to feed the horses, testified that he stood by the side of the car with plaintiff when it arrived and there was no noise in the car; it was suggested everything seemed all right and the car be put on the tracks where they could get to the horses and feed them; the train crew then took the car and switched it on to that track and left; that they then went up to the car to open it; there was a great racket in it as they did so, and as soon as they got the door partly opened they could see a big grey horse down by the door,—

"there was stampeding and a great deal of noise in the car and something had to be done right away. Mr. Shier made the remark that the car would have to go to the stock chute.    I also knew that horse car would have to go to the stock chute.

"*Q.* What did you do?

"*A.* I went into the office and telephoned Mr. Frye. He is assistant agent for the Omaha and calls out the crews.

"*Q.* And what time was that?

"*A.* About 11:10.  *  *  *    There was one fireman in the office.    I told him that that fireman was in the office and he said that it would be O. K. to call out that crew.    That crew wasn't the same crew that brought in this passenger train.    It was a different

crew.  Frye called back in just a few minutes and said I could not have a new switch crew.  I told him I had to have somebody right away, that we would be in trouble on that car of horses, that he had to come down and take care of me.  Mr. Frye came down to the office.  \* \* \*  The new train crew which Mr. Frye ordered out was at the depot at 12 o'clock, that is the engine crew which was going to take the horse car from the track and put it to the stock chute. \* \* \*  We started unloading about 12 o'clock, just a little bit after midnight.  When all of the horses were out of the car it must have been about 3 o'clock. \* \* \*  After the horses were unloaded it was about 6 o'clock in the morning that I met Mr. Shier, and I had my men there, and we took these horses down to Hanley's barn from the stock chute.  \* \* \*  It was dark and it was cold.  \* \* \*  I wouldn't have got in the car.  The horses were standing and kicking.  It was taking a big chance."

With this testimony that the horses were quiet and all right when the train arrived at a late hour in a cold winter night, that the train crew was in a hurry to get home and when they hooked on to the car to switch and spot it on the side track, started right off in a hurry, handled it pretty rough, weren't gone very long, and then left in a hurry, and right after the car was spotted some of the horses were found down, while the rest were found in confusion and "stampeding," we think there was evidence to carry the question of defendant's negligence to the jury.  Defendant's counsel urges there was not, because plaintiff's statement that they handled the car "very rough" was a mere conclusion.  He had some experience in railroading and applied that description to what he saw.  "Rough" or "roughly" is defined as *careless—hasty—crudely done—rudely—characterized by violent or disorderly action.*  (Cent. Dict.)

Courts have been content to refer to negligent switching as "rough handling" of the car.  *Jeffries* v. *Railway Co.*, 88 Neb. 268 (129 N. W. 273).

Reversible error is urged against the above quoted portion of the charge in which the court allowed the jury to consider the delays in movement of the car which defeated its direct connection at St. Paul with a train which would have reached Hurley at 8 o'clock on the evening of that day.    This was expressly limited to its bearing upon defendant's claimed negligence in handling the shipment at Ashland.    While it is true that under this contract defendant was only bound to transport the stock with reasonable despatch and care in operating its means of transport, it was competent to show, as bearing upon the situation which arose at Ashland, both the time consumed on that particular trip and the customary time taken for such transportation.    *Young & Co.* v. *Railway Co.*, 201 Mich. 39.    This was an express shipment to be carried in connection with passenger trains.    The scheduled train connections, if made, would have delivered the shipment at its destination in Hurley over two hours before it reached Ashland.    Plaintiff had shipped express consignments of horses over that route before and connected through to Hurley on time.    He testified that when he had on several previous occasions taken loads of horses over that run "we got into Hurley at 8 o'clock."    He reassured himself on this occasion by asking the agent at Deep River, who, he testified, told him the shipment would be in Hurley at "8 o'clock the following evening."    The admission of what the agent told him is urged as error, because "the verbal agreement of an agent to transport stock by a particular train at a particular time is void."

That such a verbal agreement is void may be conceded, as applied to interstate shipments under the Federal act to regulate commerce.    Had the trial court held the reply by the agent a binding agreement, it would have been error.    The court did not, however, instruct the jury that it could be considered as

evidence of a binding agreement, but that the parties were bound by the terms of their written contract which was explained at length. Proof of plaintiff's inquiry and the agent's answer were not admitted as evidence of a contract, but for its possible bearing on what followed. It was competent for the jury to consider as bearing on the question of plaintiff's contributory negligence. Upon that subject defendant's counsel went at length into details of the trip, covering plaintiff's conduct from the beginning both as to what he did and failed to do, and what he said to defendant's agents and they said to him.

Defendant knew that owing to its lack of available power and weather conditions the train with which the car first connected after starting on the trip was so often incapable of meeting the demand that orders had been promulgated limiting the number of cars it should take, which was liable to, and did, result in this shipment of horses being delayed. It was defendant's duty, when proper inquiry was made of its agent before the consignment started, to truthfully advise plaintiff of the situation. The court did not hold failure to do so actionable negligence, but, on the contrary, instructed the jury that liability could not be predicated on any delay prior to the arrival of this car at Ashland, and only permitted delays and other circumstances attending the transportation to be taken into consideration so far as they might throw any light on the condition of the horses when they arrived at Ashland, and whether they were thereafter handled by defendant with reasonable care and despatch in switching, moving the car, and helping to unload them under the circumstances which had arisen. We find no reversible error in admission of the testimony complained of for the purpose stated, or the charge of the court in relation thereto.

Plaintiff's contract for transportation states over

his signature that the car load consisted of 28 horses, while his own testimony shows that car load consisted of 32 horses. His original declaration, under which a previous trial was had, counted on a contract for transportation of 28 horses, and remained unchanged until the second trial of this case, under review here, was entered upon, when, against objection, plaintiff was permitted to add a count to his declaration alleging 32 horses. Under the general proposition that the shipper may not be permitted to impose on the carrier obligations beyond the contract they entered into, defendant strenuously urged in the court below and here that a verdict should have been directed in defendant's favor on that ground.

Plaintiff was a man of several years' experience in rail transportation, both by express and ordinary freight shipment. His evasive testimony, based on claimed ignorance of the nature of his contract and the number of horses loaded in the car, is pitiful, if true, but was for the jury. Whether he gave the number as 28 to the agent at Deep River, who filled out the contract in triplicate, is in dispute. Twenty-eight horses was the minimum load for cars of that type. It was shown as customary to load all the horses in a car it would accommodate, since they shipped better when loaded tight. Plaintiff's agent who loaded them testified that defendant's station agent was there when they were being loaded. The latter testified that when he asked plaintiff for the number of horses he replied—"28, that was the minimum." It was undisputed that the horses were always counted at destination and charges collected for the number of horses carried. Plaintiff paid and defendant accepted full express charges for 32 horses carried in this car. Under those circumstances we find scant foundation for the imputation of fraudulent conduct in loading 32 horses when they were

carried at the shipper's risk of their kicking, smothering or otherwise damaging each other or of any loss resulting from their condition or propensities, where the carrier charged and received full express rates for all horses in the car. We find no error in the court's refusal to direct a verdict for the defense on that ground. The Federal classification recognizes an additional charge for each horse in excess of the specified minimum number of horses in cars not stalled.

Defendant introduced in evidence certified copies of certain schedules, rules, and rates authenticated by the commission claimed pertinent to this contract, which contained symbolic letters and numbers with a multitude of figures for computing rates, and for convenience of the court called an experienced expressman to explain their import, and how, according to those traffic rates and schedules, the charges for transporting this car load of horses from Deep River to Hurley, including the excess, should properly be figured. The court sustained an objection to such testimony, saying "that is part of the court's duty to figure out, after the rules and regulations are introduced." The court did not, however, thereafter figure anything out, nor, when instructing the jury, make any mention of the Federal interstate commerce law or ·the rules, schedules, and rates promulgated pursuant to it; but instructed the jury without any qualification that under the quoted provision of the contract the measure of damages must be computed on the basis of the value of the animals at the place and time of shipment.

Plaintiff testified, over defendant's objection, that the car load of horses cost him at Deep River $6,713.15, including $465.65 for commission and other expenses, which was their value at that time and place. His bill for the 5 horses which died, including $40 expenses for each, was $1,415. The balance of his claimed damages was for depreciation of 10 other

horses, resulting from defendant's alleged negligence in switching the car at Ashland.

While the carrier may not wholly relieve itself by contract from damages imputable to its own negligence, its liability in this class of shipments may, under the interstate commerce act, be limited by contract, if the limitations be just and reasonable.

On the line in the contract stating the number of horses as 28 appears $150, which, however, is beneath a heading "Value of paraphernalia." Defendant claimed this represented the declared or release value of each horse, as no paraphernalia was listed or valued and the interstate commerce classification rules for receiving shipments requires that "The value of the property must be declared by the shipper, and inserted in the receipt." Plaintiff testified he gave no value to the agent who made out the contract. Defendant's agent at Deep River who filled out the contract, made in triplicate by use of two carbon impressions, testified it was the same when plaintiff signed it as when produced in evidence. As bearing on plaintiff's denial of valuation, he was asked: "What did you say to Mr. Shier regarding the released value of the horses and what did he say to you?" The court sustained plaintiff's objection to this on the ground it was incompetent, irrelevant and immaterial. Bearing upon that issue, defendant's "car load delivery sheet" with plaintiff's receipt is, in part, as follows:

"Forwarding office, Deep River, Iowa.
36 hour extension executed.    24.18.
Description.    28 head horses—weight—12,000.
Route  C.  &  N.  W.  Mason City—C. R. I. & P. St. Paul, 2/11/21.
Destination, Hurley, Wisconsin.    Consignee, R. R. Shier.
Value, $150.00 each.    Class 1.    Scale or rate 41.
Loaded at 2:45 P. M. Feb. 11, '21.    Man in charge with contract.
(Above filled out at Deep River.)

Upon arrival at Hurley, following written in:
'Car contained 32 head.'    Delivered Feb. 14, 1921.
Received from American Railway Express Company, shipment described hereon.    Signed as follows:
'R. R. Shier, five horses killed several injured.'
Consignee."

The "shipment described hereon" for which plaintiff receipted stated the car load of horses was valued at "$150 each."    Whether there was a declared or release valuation by the shipper on this car load of horses was open to question under the written evidence, and the court was in error in excluding the proposed testimony of defendant's agent upon that subject.    Read in the light of the rules, schedules, and rates approved by the interstate commerce commission, the basis for computing damages specified in the contract is subject to modification and not necessarily controlling.    Defendant was entitled to have the case submitted to the jury in harmony with the laws and authenticated schedules, rules and rates relating to interstate commerce.    Failure to do so lends ground for the claim of an excessive verdict.

Whether or not any of the horses were dead or injured on arrival of the car at Ashland was a question of fact.    In view of the exempting provisions of sections 3 and 5 of the contract and plaintiff's own testimony as to his failure during the trip to examine or inspect the horses in what his own witness said was the only proper way, we think the court erred in refusing to charge the jury in compliance with the following request of defendant:

"The mere proof that some of these horses were dead upon arrival of the car at Ashland, Wisconsin, and that other horses were injured there upon or after arrival, is not sufficient of itself to establish or prove any negligence on the part of defendant express company, or to establish its liability in this case.    The evidence must go further and the burden of proof is

upon the plaintiff to establish that such damage was due to human agency."

For these errors the judgment is reversed and a new trial granted, with costs to appellant.

BIRD, C. J., and SHARPE, FELLOWS, WIEST, CLARK, and McDONALD, JJ., concurred.

Justice MOORE took no part in this decision.